Simon B. Brown and Sarah Jane Brown, his Wife, v. Pine Creek Railway Company and the Fall Brook Coal Company, Appellants.

*Waters—Extraordinary flood—Act of God—Evidence—Question for jury —Railroads.*

In determining whether a flood is ordinary or extraordinary, the jury must consider what should be expected in that particular stream, taking into account its character, the adjacent territory and previous floods.

In an action against a railroad company to recover damages for injuries to land caused by the breaking of a culvert during a flood, a finding of the jury that the flood was an ordinary one will be sustained where the evidence for the plaintiffs, although contradicted, tended to show that in a period of forty-two years, including the flood in question, there had occurred five floods in the stream of about equal force and volume of water.

*Railroads—Construction of works—Negligence—Damages.*

A railroad company is bound to bring to the execution of its works the engineering knowledge and skill ordinarily known and practiced in the construction of such works. If it constructs a culvert so unskilfully and negligently as to be insufficient to vent the ordinary highwater of the stream, the company will be liable for the injury thereby caused.

*Railroads—Land damages—Construction of works—Release.*

In an action against a railroad company to recover damages for injuries caused to land by the breaking of a culvert, the railroad company offered in evidence a release by the plaintiff of all damages "by reason of the location, construction and operation of" the railroad. The company offered no evidence as to the time when the lease was executed, but relied upon certain vague statements of the plaintiffs to show that it was executed after the construction of the culvert. The jury found specially that it was executed prior to the construction of the culvert. *Held,* that a judgment for the plaintiffs should be sustained.

Argued June 2, 1897. Appeal, No. 102, Jan. T., 1897, by defendants, from judgment of C. P. Lycoming Co., Sept. T., 1894, No. 389, on verdict for plaintiffs. Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL, DEAN and FELL, JJ. Affirmed.

Trespass for injury to land by the breaking of a culvert. Before METZGER, P. J.

The facts appear by the opinion of the Supreme Court, and by the charge of the court below as follows :

This is an action of trespass brought by Simon B. Brown and Sarah J. Brown, his wife, against the Pine Creek Railway Company, for the purpose of recovering for an alleged injury caused to the farm owned by the plaintiffs, situate on Pine creek, and which injury is alleged to have been sustained by reason of the unskilful and careless construction of a certain culvert and bridge on the line of their road, which runs through the farm of the plaintiffs. The plaintiffs, it appears from the evidence in the case, own a farm up Pine creek—that is, on Big Pine creek, as it is called, and a portion of the land is what is called bottom land. That is, the portion that is level lies on the bottom along the creek, and a portion of it is uneven or hilly land. The farm contains, as I understand the testimony, sixty-odd acres of land, about thirty of which are called bottom land. The Pine Creek Railroad Company, one of the defendants in this case,

which was known at the time as the Jersey Shore, Buffalo and Pine Creek Railway Company, constructed or commenced the construction of a railroad which ran nearly through the middle of the farm of these plaintiffs in 1882, and in the course of the construction of that road it built an embankment, which is shown by the model there, extending from a point around one of the hillsides, to the stream of water—Pine creek. This embankment is, I believe, at some points about sixteen feet high, and it extends from a point along the hill lands to the creek, a distance of nine hundred and fifty feet; and over the stream of Pine creek it constructed a bridge of two spans, which in length, originally, according to the testimony was two hundred and ninety-eight feet. The bridge, as you will see by the model, was constructed so that the abutments which were placed there were placed right on the edge of the water on either side of the creek. It also appears from the model, and from the testimony in this case, that somewhere near the point where the land becomes hilly, or along the mountain side, there was at one time a mill race running from the creek on the one side of the embankment to the creek on the other side. The land where this mill race is supposed to be is somewhat low, and there is a depression there. Now it is alleged by the plaintiffs that in the construction of this embankment the company should have put a culvert where this mill race formerly was, where it runs through under the railroad or would run through under the railroad, in order to carry off that water that would come into that depressed place where this mill race formerly was. One end of this old mill race did not seem to be more than from seven to ten feet above low water mark in Pine creek (there is no exact testimony on that point). Of course, when Pine creek would rise, the water would run into that low place and would find no outlet unless, as was claimed on the part of the plaintiffs, there was a culvert to pass it through this embankment under the railroad. It is also alleged on the part of the plaintiffs that the bridge was not properly constructed in this : that it was not sufficiently long to vent the water that would have to pass through in ordinary high freshets, and that by reason of this defective construction they were injured, and they claim that the injury arose in this way : that in 1889 there was a high flood, and by reason of the fact that there was not sufficient space pro-

vided for when this bridge was built to vent the water running in there, that the water was backed up until it rose to the top of this embankment and began to run over, the embankment gave way, and suddenly the lands on the other side of the embankment belonging to the plaintiffs in this case were flooded to a number of feet, and the soil of a large quantity of the land washed away, leaving nothing but a gravel bar, you might say, and stone; also taking away the fences and the young orchard of the plaintiffs; and taking away and destroying the barn, which it is alleged, was new, and all the outbuildings, wagon shed, corncrib, smokehouse, pigpen, henhouse, etc.; that the water came up to the dwelling house, although I believe there is nothing claimed for that, as no actual damage was done to that building.

Now, that this injury was sustained by reason of the water, there can be very little dispute. The question in this case is: Who was to blame for it? Was this flooding which caused this injury the result of the act of God alone, or was it the result of the negligence of the defendant company concurring with the act of God? If it was caused by the act of God, independently of the act of the railroad company; if its road was properly constructed; if this embankment was properly constructed, and if it provided the proper means for venting the water that comes through the creek, so that it would not do any unnecessary damage; if it did this and did it in such a manner that it would have avoided the injuries being done in ordinary high freshets, then the defendant company would not be liable. Then it would be regarded as the act of God alone, and for that there could be no recovery. But it is contended on the part of the plaintiffs that there was an unskilful and negligent construction of this embankment and bridge in the particulars I have mentioned. That, in the first place, there was no culvert provided under that embankment for the passage of the water that would naturally flow into that depression that was formerly a mill race, and that that would find no outlet, by reason of the fact that there was no outlet provided by the company. That is one matter that is complained of. The other is the fact, as they allege, that this bridge which was built only of two spans, and was only in length 298 feet, was not sufficient to vent the ordinary high water of the stream that would

have to pass through there.   If this be true, then the plaintiffs would be entitled to recover.   A railroad company is not bound to provide for contingencies which could not ordinarily be anticipated.   Therefore, it is not bound to provide for an extraordinary flood that could not be expected, whose coming is not foreshadowed, and which would be unprecedented, and of such a character as ordinary prudence would not be able, and ought not to be required, to anticipate.   But it was bound in constructing its road and work to bring to its execution the engineering knowledge and skill ordinarily known and practiced in such work, and it is liable if it so negligently and unskilfully construct them as to be insufficient to vent the ordinary high water of the stream.   In such a case, as I said, it is liable for any injury that is caused thereby.

It is the duty of a railroad company, by its engineers, in constructing a road of this kind, to take into consideration the size and character of the channel and the declivity of the circumjacent territory, which forms the watershed ; and from this and other circumstances determine the probable quantities of water to be passed through.   Now, there are other circumstances that I will speak of by and by, and that is the notable previous floods. " An engineer must supply the means of avoiding injury which would result from locking up the natural flow and obstructing the passing of the water so as to cause a reflux in times of ordinary high water."   This is substantially what the Supreme Court have decided, and is the law as applicable to this case.

Now, what are the facts in this case ?   You have the testimony of three or four engineers—three, at least, that I recollect —in reference to the character of this stream and in reference to the location of it; the declivities on either side of it, and also its size and its flow, the rapidity of its waters and a number of other circumstances.   Many of the facts that have been testified to, if not nearly all, are shown on that model.   You will observe by looking at it that on either side of this stream is high land, particularly on the one side there seems to be a very steep declivity.   It also seems that on the other side of the stream there is a declivity.   It also appears that the stream is located in a valley that is quite narrow.   I do not know how many hundred feet it is, but it can't be many from the appearance of that model and the scale upon which it is made.   You will also observe

there that the stream is by no means straight. It is devious and crooked. Of course, the rapidity of the water is not shown on it, but that is testified to. Now, they have testified to these facts, and there can be no question, probably, from the testimony but that that model is at least nearly accurate.

Now, of course, these circumstances that I have alluded to here, it was necessary for the engineer in constructing that bridge, culvert and embankment to take into consideration. He was confronted there by a certain state of facts, which he was bound to take notice of, and to conclude from them, at least, what would be the natural result of floods, and what kind of floods could naturally be expected on that stream. Then we have the additional testimony that there were prior to 1889 some four floods, I believe, which were as high or nearly as high as the flood of 1889. The flood of 1865, it is alleged by a witness who testified in this case, was either within an inch or about an inch higher than the flood of 1889. The other floods that were referred to by the witnesses, the floods of 1847, 1852 and 1870, were within some inches or at least within a foot or so as high. Now, it is for you to determine from all the circumstances that I have detailed to you—the topography of the country surrounding this stream, the character of the stream and the location of it, and the floods that had occurred previously, and ascertain from these facts: first, whether these floods can be regarded as ordinary floods, and if so, whether the flood of 1889 on Pine creek was not an ordinary flood. I would say to you, gentlemen of the jury, that if there had been no floods at any time on Pine creek approaching in height the quantity of water of the flood of 1889, that it would be an end of this case. The plaintiffs could not recover, because then it would be clearly an extraordinary flood, against which the company were not bound to provide. But the question is whether, in view of the fact of these other floods that have been testified to by the witnesses as having occurred previously, and the number of times that they have occurred, together with the other circumstances that I have mentioned, whether under all this testimony, this flood of 1889 was really an extraordinary flood on Pine creek. If it was not, but was such a flood by reason of the facts and circumstances I have detailed to you that ought to have been anticipated by the company, then the

company is clearly liable for any damages that have been caused by reason of it not providing sufficient space to vent the water, so that it would not cause the injury complained of.

Now, you are not to consider, when you are considering this question, what floods might have been in other streams. That is not material in this case. It is not evidence. It is a well known fact that some tributaries of streams in 1889 were much higher than others. Great floods in the West Branch, for instance, were caused by a number of tributaries flowing into it, not by any one, and while some of the tributaries may have been extraordinarily high, others might not have been, inasmuch as the falling of the water was not alike in all places, and it therefore would not follow that because it was an extraordinary flood in Lycoming creek, for instance, or in the West Branch, that it was an extraordinary flood in Pine creek. In considering what is an extraordinary flood in a particular stream you must take into consideration what should be expected in that particular stream from the character of it, the adjacent territory and the other circumstances that I have mentioned of the previous floods, all taken together.

I am free to say that if there had been but one flood approaching in height the flood of 1889, I think that that might be regarded as an extraordinary flood. Because one flood happened many years previous thereto might not have been sufficient to have put the company upon notice, but the fact that there were four floods that so nearly approached the height of the flood of 1889, in connection with the other circumstances, does that satisfy you that these were ordinary floods on Pine creek; that in the ordinary course of nature they could be expected? If they could, then they were ordinary floods, no matter how high they were. That which would naturally be expected is not an extraordinary thing; it is the unnatural and the unanticipated, or rather I might say that which is not foreshadowed by anything that is known, that is really extraordinary. That which is foreshadowed, or which has been known in previous years, may or may not, according to the circumstances, be extraordinary, or it may be common and ordinary, and if so, then the company was bound to provide against it, and if you find then, that by reason of these previous floods, the flood of 1889 in Pine creek was really but an ordinarily high flood for that stream, then the

defendant company was obliged to furnish space enough under that bridge to vent the water without doing the damage complained of.

Now, this is a question of fact entirely for you, and I have given you my best judgment as to what the law is as applicable to this point. High water could be expected, of course, in any stream, and whether a certain height is extraordinary or not, depends entirely upon the circumstances of that particular stream and on nothing else. If, for example, the character of the stream was such, and it was located at a point where you could see that by reason of the declivities the watershed was of such a character that it would precipitate a large amount of water, an undeterminable quantity, and a skilful man were to see this (and of course he does see it when he is upon the ground) and could not tell what quantity of water might or might not be passing along that stream in ordinary high water, then it is a question for you to determine from all the circumstances whether it would not be his duty to inquire, if by inquiry it could be ascertained, what was the probable quantity of water that would be expected to flow through that stream in ordinary high freshets. A man cannot shut his eyes to facts that are apparent and that indicate a certain other state of facts. He must take them into consideration in determining these questions, and if he cannot determine them, must get all the light he can, if there is any to be had in any other way.

Now, there are some facts that have been testified to here from which you can about determine the adequacy of this space under the bridge to vent the water of an ordinary high freshet. As I said, the bridge is two hundred and ninety-eight feet in length, and it would appear from the testimony of the engineer that at the time when this accident occurred, and this embankment was shoved out by the water behind it, that it caused a rise of about four feet, and as I understood the testimony that height continued for only about an hour ; that in about an hour it fell down four feet, thus indicating that that embankment made the water four feet higher than it otherwise would have been if it had not been banked up there. That is the way I understood the testimony. If that is true, it would indicate that the passage left there for the venting of the water was not sufficient to pass the water of that flood, and, therefore, if it was only an

ordinary freshet, such as in the course of nature could be expected, the company clearly would be liable in this case. That would be so if it was but an ordinary freshet for that stream, and you are to be confined to that stream and that alone.

Now, if you find from all the evidence in this case, that this was not an extraordinary freshet, and therefore was not such as could not be anticipated, and was in view of all the circumstances and of the previous floods, really an ordinary freshet, and if you should find in addition to that that the bridge as constructed by this defendant company did not provide sufficient space for the passage or venting of all the water through it in ordinary high freshets; if you find that fact and the others that I have stated, and find also that by reason thereof this injury was caused, then your verdict would have to be for the plaintiffs for such damage as they have suffered by reason thereof; if otherwise, your verdict would be for the defendant.

There has been another legal question raised in this case, which is not for your determination and with which you will have nothing whatever to do. It will be for the court to determine if you should find for the plaintiffs in this case, but it is necessary in order that the court may be able properly to rule the question of law that you should find a certain fact, and therefore if you should find for the plaintiffs, we will ask you to find also this fact, to which we will refer, and find it in the nature of a special verdict, so that we will understand exactly what the real facts in this case are, and the question is this: A release was offered in evidence on the part of the defendant company, executed by the plaintiffs in this case for a right of way over this land. A dispute has arisen. That release is dated January 18, 1883, and a dispute has arisen as to whether this embankment and bridge were constructed before January 18, 1883 —that is, before the execution and delivery of that release. If that release was executed before the completion of the construction of the embankment, piers and abutments of this bridge, then that release could have nothing whatever to do with this case, but it will raise a question of law if it was executed and delivered after the completion and construction of the embankment and abutments and piers of this bridge; so that if you find for the plaintiffs your verdict will be in form as follows; We find in favor of the plaintiffs the sum of———and we

further find that the release of January 18, 1883, executed by the plaintiffs and the defendant company, was executed and delivered (here state whether before or after) the construction of the embankment and bridge in controversy. If on the other hand your verdict should be for the defendant, then it will be simply this : We find in favor of the defendant; because there is but one defendant. A discontinuance has been entered as to the Fall Brook Coal Company. Your verdict will be subject to this reserved question : if the jury should find that the release of the plaintiffs to the defendant company, dated January 18, 1883, was executed after the construction of the embankment and bridge abutments and piers in controversy, the court reserves the question of law, whether such release is a bar to this action, and if the court should be of opinion that such release is, then judgment non obstante veredicto to be entered for the defendant.

The verdict of the jury was as follows : " We find in favor of the plaintiffs in the sum of $4,933. We also find that the release of January 18, 1883, executed by the plaintiffs to the defendant company, was executed and delivered before the construction of the embankment, bridge abutments and pier in controversy."

Judgment was entered upon the verdict.

*Error assigned* among others was the charge of the court as a whole, quoting it.

*John J. Reardon* and *S. R. Peale*, with them *J. Harrison*, for appellant.—The injury to the plaintiffs in this case was caused by the extraordinary flood of June 1, 1889. It was the act of God. It is damnum absque injuria, and this, according to plaintiff's own evidence: Bell v. McClintock, 9 Watts, 120 ; Pittsburg, Fort Wayne & Chicago Ry. v. Gilleland, 56 Pa. 445; Balt. & Ohio Ry. Co. v. Sulphur Spring School District, 96 Pa. 65.

The written release of January 18, 1883, from plaintiffs to defendant, is a bar to plaintiffs' action, and the legal effect thereof was a question of law for the court: Hoffeditz v. South Penna. Ry. & M. Co., 129 Pa. 264; Updegrove v. R. R., 132 Pa. 540 ; McCaty v. St. Paul, M. & M. Ry. Co., 14 Am. & Eng.

R. Cas. 297; Norris v. R. R., 28 Vt. 99; McMinn v. Pittsburg, etc., Ry. Co., 147 Pa. 5.

The charge of the learned trial judge to the jury was, as a whole, we respectfully urge, partial to the plaintiffs, and inadequately presented the defendant's side of the case. The fact that a party's own evidence may be as fatal to his case, as the evidence of his adversary, seems to have escaped the attention of the court: Reber v. Herring, 115 Pa. 599: Pierson v. Duncan, 162 Pa. 187.

*Henry C. McCormick*, with him *Seth T. McCormick*, for appellees.—The flood of 1889 was not an extraordinary flood: Pittsburg, Ft. Wayne, etc., R. R. v. Gilleland, 56 Pa. 445.

If it be contended that the flood of 1889 was the act of God, then our answer to that is that the defendant company cannot be relieved from liability upon that ground, if its negligence has contributed to the injury: Lehigh Bridge Co. v. Lehigh Coal & Nav. Co., 4 Rawle, 24; Livezey v. Philadelphia, 64 Pa. 106; Baltimore & Ohio R. R. v. Sulphur Spring School Dist., 96 Pa. 70.

As to the liability of the railroad company generally, we cite: Philadelphia & Reading Railroad Co. v. Anderson, 94 Pa. 351; Dugan v. Bridge Co., 27 Pa. 303; Jones v. Western Vt. R. R. Co., 65 Am. Dec. 206; Johnson v. Atlantic & St. Lawrence R. R. Co., 69 Am. Dec. 560; Sullens v. Railway Co., 7 Am. State Rep. 501; Scott v. Hunter, 46 Pa. 192; Pittsburg City v. Grier, 22 Pa. 54; Gray v. Harris, 107 Mass. 492.

The defendant company by the release of January 18, 1883, had no greater or higher rights than it already had by virtue of its condemnation proceedings; even if the abutments and piers had been built previous to January 18, 1883: 2 Woods on Railroads, 1118, 1119 and 1120; Fehr v. Schuylkill Nav. Co., 69 Pa. 167; Morris Canal & Banking Co. v. Ryerson, 27 N. J. Law, 458; McMinn v. Pittsburg, etc., Ry. Co., 147 Pa. 5.

OPINION BY MR. JUSTICE DEAN, October 11, 1897:

The plaintiffs were, and for many years had been, the owners of a farm, containing sixty-six acres, in Cummings township, Lycoming county. Its northern boundary was Pine creek. In September, 1882, the predecessor of what is now the Pine Creek

Railway Company, appropriated for railroad purposes, under its right of eminent domain, a roadbed ninety feet in width, and in quantity about four and three fourth acres, running through the farm. The parties could not agree upon the amount of damages, and viewers being appointed to assess them awarded to plaintiffs $593.75. From this award the railroad company, on October 5, 1882, appealed. On November 2, following, issue was framed on the appeal. On January 18, 1883, the parties, by agreement in writing, settled the issue. The material parts of the agreement, as concerns the present contention, are as follows:

"Know all men by these presents, that we, James Ramsey, of Watson township, and Simon B. Brown and Sarah Jane, his wife, in right of Sarah J. Brown, of the township of Cummings, county of Lycoming, and state of Pennsylvania, for and in consideration of the benefits and advantages which will result to us from the location and construction of the railroad of the Jersey Shore, Pine Creek and Buffalo Railroad Company and its branches, and the further consideration of $1200 paid by the said railway company, the receipt of which is hereby acknowledged, have granted, bargained, sold, released and quit-claimed unto the said railway company, and to their successors and assigns, the right to enter upon, use and appropriate a strip of land ninety-nine feet in width, said strip of land to be sixty-six feet wide on the west side and thirty-three feet on the east side of the center line of said railway, for the construction and use of said railway as the same is now located over our lands in the township of Cummings, county of Lycoming and state of Pennsylvania. . . .

"And we, the grantors, do hereby release to the said railway company all claims for damages which we have sustained or shall sustain by reason of the location, construction and operation of its said railroad or branches."

In the fall of 1882, the winter of 1882 and 1883, and spring of 1883, the railroad company constructed a fill or embankment for its roadbed on the land appropriated, from a point on the rising ground eleven hundred feet distant from Pine creek, which latter it crossed by a bridge. At the bridge the embankment was about twenty-three feet in height. The bridge was constructed on piers and abutments. The company, having finished

the construction of its road in 1883, operated it until June 1, 1889, when a flood swept away the embankment and bridge, also plaintiffs' barn and outbuildings and orchard; the top soil of the bottom land, between the embankment and the creek, was also washed off. Plaintiffs, alleging their injury was caused by the negligent and defective construction of the embankment and bridge, that the two together were so planned and built that they formed in time of freshets a dam for the water of the creek, causing it to back and sweep over his buildings and land, brought this suit for damages. At the trial in the court below, defendant offered no testimony, but relied on two grounds of defense; (1) the flood of June 1, 1889, was an extraordinary flood, an act of God, for which defendant was not answerable; (2) the agreement of January 18, 1883, was an effectual bar to plaintiffs' action.

The court submitted to the jury three questions on the evidence: first, was the flood an extraordinary one, which could not reasonably have been foreseen and provided for? If it was, then defendant was not answerable. If it was but an ordinary flood, then, second, were the embankment and bridge so negligently constructed that they caused the damage? If they were negligently constructed and caused the damage, then, third, were they constructed before the release of January 18, 1883? The last question was to be answered by a special finding, the effect to be determined by the court on a question of law, reserved, to wit: the interpretation of the written release.

The jury found for plaintiffs, and the court, afterwards, in opinion filed, entered judgment on the verdict. Defendant appeals, assigning eight errors. The first to fifth, inclusive, have nothing to sustain them. The complaint in the first of the improper admission in evidence of the record showing the appointment of viewers is not well founded in view of the purpose of the offer; that is, to show the appropriation of the land by defendant and the date of it. The remaining four assume there was no evidence for the consideration of the jury; therefore, a verdict should have been directed for defendant. This is a mistaken assumption. The court was clearly right in deciding the case was one principally of fact to be determined by the jury from the evidence.

The sixth, seventh and eighth suggest three propositions:

1. Did the evidence establish indisputably, the flood was an extraordinary one, and, therefore, one which defendant was not bound to anticipate in the construction of the embankment and bridge? 2. If it did not, then was there evidence of negligence in construction which was the approximate cause of the damage? 3. Was there any evidence to submit to the jury that the release was executed before the construction of the embankment and bridge?

As to the first: The flood of June 1, 1889, generally known as the " Johnstown Flood," extended nearly over the entire area of the state. At many points it was, unquestionably, extraordinary in its force and destructiveness; at others, it was not. Whether it was extraordinary on Pine creek, a tributary of the Susquehanna, was, on this evidence, a question of fact. The testimony was somewhat conflicting; some of it tending to show it was of such an exceptional character that a builder could not reasonably have anticipated it; some of it, however, tending to show it did not exceed in force and volume of water the ordinary spring flood. Much of the apparent conflict arose from the difference in language adopted by witnesses to express the same idea. For example, it was established, that in a period of forty-two years, including the flood of 1889, there had occurred five floods in this creek of about equal force and volume of water. Some of the witnesses termed these floods, big floods, extraordinary floods; others said, the one in 1889 was about the same as other floods, meaning the three or four previous ones, which they remembered particularly, because of their destructiveness. That an extraordinary flood may occur more than once in a series of years cannot be questioned, and the repeated occurrence does not, of itself, warrant the conclusion it was only ordinary; nevertheless, as said by this Court in Railway Co. v. Gilleland, 56 Pa. 445: " But the frequent occurrence of what was supposed to be extraordinary was some evidence that the real character of all these floods had been mistaken by those who testified as to their extraordinary character, and that they were really only ordinary freshets, though measuring up to the highest altitude of that class. It was proper, therefore, to submit this question to the jury with instructions, if they so found the fact, to apply the rule as to ordinary freshets."

The learned judge of the court below embodied exactly this

idea in 'his language to the jury, thus: " I would say to you, gentlemen of the jury, that if there had been no floods at any time on Pine creek approaching in height the quantity of water of the flood of 1889, that it would be an end of this case. The plaintiffs could not recover, because then it would be clearly an extraordinary flood, against which the company were not bound to provide. But 'the question is whether, in view of the facts of these other floods that have been testified to by the witnesses as having occurred previously, and the number of times that they have occurred, together with the other circumstances that I have mentioned, whether under all this testimony, this flood of 1889 was really an extraordinary flood on Pine creek. . . .

" In considering what is an extraordinary flood in a particular stream you must take into consideration what should be expected in that particular stream from the character of it, the adjacent territory, and the other circumstances that I have mentioned of the previous floods, all taken together."

This same instruction was more than once repeated; it was correct, and the jury could not have failed to understand it. They found this was just such a flood as residents of that neighborhood might, from their observation, expect and, therefore, was not extraordinary.

As to the second, was there negligence in construction? There was abundant evidence from which the jury was warranted in finding that if this 1889 flood was an ordinary one, then the construction of the embankment and bridge made no provision for it; the vent was wholly insufficient for the escape of that quantity of water, and the structure served but as a dam to aggravate the destructiveness of the accumulated water. The constructing engineers of defendant were bound to know the ordinary high water of the stream and make provision for it, because ordinary inspection of the watershed and fall, as well as inquiry of those who lived near the stream and were familiar with its history, could have shown them, what should be the design and capacity of their proposed structure. The rule applicable is stated in Railway Co. v. Gilleland, supra: " We must conclude, therefore, that though the state's right of eminent domain is committed to the company, and it may lawfully enter and build all such structures, proper to accomplish the purpose of its charter, without liability for damages, further

than is provided for in its charter, yet this does not justify unskilfulness and unnecessary injury in the mode of performing the work, or in the character of the structures erected.    The company is bound to bring to their execution the engineering knowledge and skill ordinarily known and practiced in the construction of such works. . . . If the culvert was so unskilfully and negligently constructed as to be insufficient to vent the ordinary high water of the stream, the railroad company building it would have been liable for the injury thereby caused.    The apparent facts indicated the duty."

But, it was scarcely pretended at the trial that the defendant had not failed in duty if the flood was an ordinary one.    The whole strength of its contention was in the averment that the flood was extraordinary, therefore, could not, when the work was planned, reasonably have been anticipated.    The fact, according to the finding of the jury, being otherwise, negligence, as an inference, almost necessarily followed.

As to the third question, was there any evidence to submit to the jury which would warrant the finding that the work was done after the execution of the release?    While the testimony on that point is meager, nevertheless, it did not clearly appear that the work was done on January 18, 1883, the date of the writing.    The land was first appropriated by defendant under its right of eminent domain; it took only the land; the character of the structure which would be put upon it was wholly in the future.    Then the proceedings to assess damages for the taking were instituted; while this issue was pending it was settled by the agreement.    There is not a word in the writing necessarily indicating an intention to include other damages than those within the jurisdiction of the viewers.    We concur with appellant that it was a very material fact in the interpretation of the agreement whether the embankment and bridge were constructed before or after its execution.    If the work was then completed, it might very fairly be assumed that the words " We do hereby release to the said railway company all claims for damages which we have sustained, or shall sustain, by reason of the location, construction and operation of said railroad," covered the claim now sued for.    The agreement should be interpreted in view of the surroundings of the parties at the date of it.    If this plaintiff, who had for years lived on this

land, had witnessed all the floods in the stream which bounded it, had before his eyes the structure which was obviously, as he now avers, insufficient to pass the water by ordinary floods, it certainly would be only a reasonable inference, that the damages he intended to release were those which might result from the structure then before him. But the date of the construction was no part of plaintiff's case. If there were surroundings dehors the agreement, which were important to an ascertainment of the real intention of the parties from their words, the burden was on defendant to show such surroundings. But it offered no evidence whatever; it now relies on plaintiff's vague statements to establish a most material fact in its case. Nothing, however, is to be gathered from his testimony, except the fact that he did not certainly know when the work was done. To repeated questions he answered that he did not know when the bridge, abutments and piers were erected. He says, "they were working there in the winters of 1882 and 1883, and commenced running the next spring." Whether the narrow vent of the bridge, for the waters of an ordinary flood, existed on January 18, ·1883, could not be determined as an established fact from plaintiff's testimony, or that of any other witness. The court, was, therefore, bound to submit the evidence to the jury to find the fact, and they have found that the agreement "was executed and delivered before the construction of the embankment, bridge, abutment and piers in controversy." It was, doubtless, in the power of defendant to prove beyond controversy the exact date of the completion of the work; it did not choose to do so. There being nothing in the agreement to indicate otherwise, the fact must be taken as the jury has found it. Therefore, from its words, at the date of the agreement, the plaintiffs intended to release just such damages as the jury of view had the authority to assess under the act of assembly.

All the assignments of error are overruled, and the judgment is affirmed.