**Symons v. Golubic**

*William G. McConnell,* for plaintiffs.

*Cyril T. Garvey,* for defendants.

ACKER, J., January 31, 1972.—This adjudication is made following the receipt of testimony in this equity action.

## STATEMENT OF ISSUES

There are four basic issues which have been presented. They are: (1) Are plaintiffs barred by laches? (2) is there liability upon the owners of the property? (3) is there liability upon the S. J. Groves & Sons Company which placed the spoil and waste upon the Golubic and Stonebraker land? (4) if there is liability, what are the damages? These matters are subsequently discussed.

## FINDINGS OF FACT

1. Plaintiffs purchased the subject property con-

sisting of 203 acres which contain 80 tillable acres and 123 nontillable acres on May 4, 1961, for $18,600.

2. Located on the western portion of plaintiffs' property and running from north and south across that portion is the east branch of the Neshannock Creek which, after passing south off of plaintiffs' property, flows through a neighbor's property of Dan D. Byler and on to defendant's, Alice A. Stonebraker's, property.

3. Alice Stonebraker died on May 17, 1971, and her son, James Stonebraker, was appointed administrator of her estate on December 9, 1968, and was substituted in this action as party-defendant.

4. In 1955, defendants, Golubic, purchased their land consisting of 94 acres, which is located to the south of plaintiffs' land and east of Stonebraker. The channel of the creek as reconstructed by defendant, Groves, was 72 feet from the west boundary of Golubic.

5. Defendant, Groves, is a construction contracting company which was the successful bidder on the section of Interstate No. 80 involved in this case.

6. As a part of the construction of Interstate No. 80, it was necessary to erect two large bridges across the valley created by the east branch of the Neshannock Creek positioned on columns and also to straighten out and channelize the flow of the creek itself as it passed underneath the spans of the parallel bridges.

7. As designed and by the State plans, the channel was to be constructed for a total length of 775 feet, which included the area immediately under the spans and north of the spans as well.

8. The flow of the creek prior to the construction was a gently falling, slow moving, generally shallow creek which divided in the area where the bridges

were eventually constructed passing around a small island between the two branches. The valley through which the creek passed was at times referred to as Pine Hollow Creek and was known by the local residents, various fishermen and hunters as being a generally marshy, dense, grownup area. Maps previously made of the area so indicate.

9. In 1963, Groves commenced work on the stream bed to attempt to straighten it and fill the marshy area so that it could be channelized.

10. It became apparent to Grove that it was necessary to find a place for "wasting" which in the trade is placing unnecessary rock, shale and dirt in an area away from the actual construction. Pursuant to that purpose, Groves entered into a written agreement with defendants, Golubic, on September 11, 1963, being Golubic's defendant's Exhibit C, permitting it to dump stump, stones, brush and excess material on their property, north of the west bound lane of Interstate No. 80 and to construct a temporary road from State Route No. 468 across their property to new Interstate No. 80.

11. A written contract was entered into between Alice Stonebraker and Groves on August 28, 1963, to permit upon her property the placing of fuel tanks, powder magazines, cap magazines and temporary top soil storage site. Oral testimony disclosed that, in addition, there was an oral agreement between Groves and Stonebraker to permit the placing of "wastage" upon her land north of Interstate No. 80.

12. Although a fill area was first erected in 1963 and was referred to in plaintiff's testimony as "Dam No. 1" under what subsequently became the overhead bridges on Interstate No. 80, this court does not find that this crossing in any way caused damage to plaintiffs now prayed for.

13. Defendant, Groves, in 1964 commenced, with the consent and permission of defendants, Golubic and Stonebraker, the "wasting" of spoil north of the right-of-way of Interstate No. 80 and proceeded down to the bed of the stream when defendant, Groves, pushed three or four 26-inch pipes into the stream bed and covered it with additional wastage.

14. The crossing over the stream bed was 30 feet in width and carried scrapers across the creek which unloaded weighed 70,000 pounds and which on occasion would pass each other on their journeys at the crossing.

15. Defendant, Groves, filled the first proposed wastage area to the level of approximately four feet above previous ground level and found that it had a need for additional wastage area and obtained permission of the property owners, Golubic and Stonebraker, completing the wasting.

16. In 1964, Groves removed the pipes from the crossing, but did not remove the roadway. It left a "spillway" which was supposed to permit the same flow as existed before the construction started, but which retained the same level as when the pipes were in place.

17. Commencing in 1964, water above the level previously contained within the confines of the creek and its surrounding low land began to rise. The water level increased until the year of 1965 when it reached its maximum height with the exception of that which would accumulate because of unusual seasonal rains.

18. As a result of the elevation in the water by measurement on October 20, 1967, it had a water mark of 1,031.71 feet above sea level which amounted to about a 12-foot depth of water at the dam site and covered approximately 56½ acres of "bottom land" of plaintiff.

19. The water backed up to the north of the area of the fill of Groves.

20. Groves did not leave the road construction operation and remove its equipment until the late fall of 1964.

21. The cause of the water backing was the fill made by wasting and the failure to retain the level of the channel of the creek at its original level.

22. In the summer of 1964, John Golubic placed a 20-foot long wire screen held with iron pipes just north of the crossing road against the dam.

23. Although, occasionally, branches and other similar debris would become collected upon this screen, neither the screen nor the debris made any appreciable difference in the elevation of the water level and was not the cause of the flooding.

24. Permission was never obtained from the Department of Forests and Waters or the Water and Power Resources Board of the Commonwealth of Pennsylvania for the erection or retention of the dam, although inquiry was made by John Golubic of the Division of Dams and Enforcements in the late spring of 1964. By a return letter from A. M. Lunetta, Chief of the Division of Dams and Enforcements, Golubic was informed that no permit is required for a dam not exceeding three feet in height and a stream not exceeding 50 feet in width where such dam is constructed for the sole purpose of creating a pool for fish and fishing purposes. Although it was suggested that Golubic submit a detailed plan for the dam, none was ever actually submitted.

25. Plaintiff, Symons, first noted that his land was flooded in the late fall of 1964. He became concerned in November and December of that year. In the summer of 1965 he went upon the lake in a boat upon his property and determined its depth to be greater

than the length of an oar. He, therefore, set out to attempt to find the responsible party. He talked to his neighbors, Dan D. Byler, Mrs. Evelyn Golubic and Alice Stonebraker.

26. Symons was unable to receive satisfaction as to who was responsible for the dam and he therefore engaged an attorney, John McWilliams, of the Borough of Mercer who wrote a letter to the State Highway Department in 1967. A response was received on August 22, 1967, informing him that the dam was constructed by Groves & Company.

27. In either 1967 or 1968, counsel for Symons wrote to Groves requesting information concerning the dam. Groves responded that it would look into the matter but it failed to communicate further with plaintiffs.

28. On June 27, 1968, the present action in equity was commenced by the filing of a complaint.

29. Plaintiff, M. Edwin Symons, and either John or Evelyn Golubic, or both of them, spoke concerning the dam on several occasions. Symons did not agree to a permanent flooding of his property.

30. In the summer of 1965, the foliage upon the trees located in the 56½ acre area which was covered by water about their base and part way up their trunk began turning yellow and the trees and other foliage died in 1965 and thereafter.

31. On July 2, 1969, defendant, Groves, brought upon the property a large piece of machinery and dug out the obstructions in the channel of the stream in and about the area of the dam removing approximately 4½ feet of the bed of the channel in order to drain the waters which had been impounded thereby. Overnight the level of the water receded and shortly the accumulation of water passed off of plaintiffs' land. The trees had long since died.

32. The land of plaintiffs was inundated with water as a result of the erection of the dam continuously from 1964 until July 2, 1969, which was the direct cause of the death of the trees in the 56½ acre area. Some of the trees were elm and would have died in any event due to an elm blight which spread throughout the area during the same period.

33. As of October 2, 1968, the trees that were in the 56½ acre area were approximately 15 to 20 inches in diameter and smaller and were of no value for commercial timber in their present state. Even if alive, they would be of no value other than for blocking. But even the elm which might have been blighted could have been used if it had not been dead sufficiently long to rot prior thereto. The maximum profit plaintiffs could have obtained per acre, there being 6,000 board feet per acre on the land, was $10 for each acre.

34. The cost of removing the dead stumps, snags and debris from the inundated land after the flooding is $125 per acre, of which approximately 20 percent is devoted to the removal of brush, which would have been required regardless of the inundation. The total cost to plaintiff as a result of the inundation was $100 per acre, but the clearing would have left the land in better condition than it was prior to the inundation.

35. As a result of the flooding of the land in question, the reduction in value of the entire 203-acre parcel, including the buildings and improvements thereof, was in the total amount of $1,000.

36. Plaintiffs never gave permission to anyone to erect or maintain a permanent dam which would cause water to back upon their land.

37. Although defendant, John Golubic, did dump some materials upon his own property in the dam site, it did not affect the level of the water and was

insignificant in amount and volume to that placed by defendant, Groves.

38. The type of foliage located in the 56½ acre area was hemlock, elm, alder, wild cherry and beech.

39. Although plaintiff had sufficient barn area to raise cattle and although a portion of the acreage at least of the area in issue could have been used for the pasturing of cattle, plaintiff did not, in fact, pasture cattle upon this area at anytime during his ownership and that cattle had not been pastured in this area by any predecessor in title of plaintiff since 1948.

40. The area in issue with the exception of the snags and fallen rotted logs and timber is now in substantially the same condition as prior to the inundation. With the removal of the snags and timber and fallen material, it can be used for the same purposes as prior to the flooding.

## DISCUSSION

I. *Are plaintiffs barred by the doctrine of laches?*

The limitation upon commencement of an action for damages to real property through trespass is six years.[1] This action was commenced in four years of the placing of the dam.

Laches is an equitable doctrine for the repose of title, claims and demands for peace and order in society.[2] It consists of negligence for an unreasonable and unexplained time under circumstances permitting diligence to do what in law should have been done.[3] The operation of laches does not depend solely upon the passage of time and in the absence of preju-

---

[1] Act of March 27, 1713, 1 Sm. L. 76, sec. 1, 12 PS §31.

[2] Gabster v. Mesaros, 422 Pa. 116, 220 A. 2d 639 (1966).

[3] Brodt v. Brown, 404 Pa. 391, 172 A. 2d 152 (1961); Siegel v. Engstrom, 427 Pa. 381, 235 A. 2d 365 (1967).

dice to the one asserting laches, the doctrine will not be applied.[4]

Equitable laches applies where the complaining party is guilty of want of due diligence in failing to institute his action to another's prejudice.[5]

A delay of less than the period allowed by the statute for the commencing of an action for money damages may be a bar in equity. However, it will not be invoked where there is no injury to the party desiring its application.[6]

In the case at bar, there was approximately a four-year delay between the initial flooding of the land and the commencement of the action. The foliage of the trees in the inundated area began to turn in the summer of 1965, which would then give a reasonable man a clear indication that permanent damage was occurring. Plaintiffs had no knowledge how long the parties who constructed the dam intended to permit it to remain. In the year 1965, plaintiffs set about to attempt to discover who did construct it and with whose permission. It did not appear that plaintiffs were gaining any concrete evidence concerning this subject. Therefore, plaintiffs hired an attorney who wrote a letter to the Department of Highways to attempt to elicit these facts. Defendant, Groves, itself, however, contributed to the delay, informing plaintiffs that it would look into the question. It then failed to apprise plaintiffs of any additional information.

Finally, there was no evidence supplied by Groves or any defendant that the commencement of an ac-

---

[4] Brodt v. Brown, supra.

[5] Wilson v. King of Prussia Enterprises, Inc., 422 Pa. 128, 221 A. 2d 123 (1966); Gabster v. Mesaros, supra.

[6] Howell v. Franke, 393 Pa. 440, 143 A. 2d 10 (1958); Lutherland, Inc. v. Dahlen, 357 Pa. 143, 53 A. 2d 143 (1947).

tion against it would have caused a breaking of the dam at any earlier date than July 2, 1969. It was a year after the commencement of the action before the dam was, in fact, broken by Groves. Testimony was received by various employes of Groves that the dam could have been broken in 1964 while the equipment was available at the site for this purpose. This does not establish, however, that the equipment would have been used for that purpose had a request been made. Therefore, there was no credible evidence upon which a court could conclude that the commencement of the action at any earlier date would have produced any different result, nor that there was any specific injury sustained by defendant, Groves, by the failure to commence the action at some earlier time.

Defendant, Groves, also contends that although plaintiffs may have a cause of action in equity, they have lost the right to money damages because of their failure to assert their right earlier. Defendant relies upon Helms v. Zeitzeff, 407 Pa. 482, 181 A. 2d 277 (1962). That case, however, is readily distinguishable from that at bar. There, a lower riparian owner attempted to divert the course of a creek and used hot water boilers with the ends knocked out as an artificial stream bed which were subsequently covered with earth to raise the level of the surface 7 to 24 feet. Unfortunately, the boilers were not attached to each other and, therefore, not sealed. Eventually, the water backed up onto plaintiffs, property, flooding basements and doing other damage. The first signs of this condition arose as early as 1937, but the action was not filed in court until 1953, after several unfortunate experiences from flooding. The claim eventually allowed for the installation of a proper drainage for $3,500 but the amount

claimed was $40,200. In denying money damages for flooding, the court noted that the claim was exaggerated and that there had been an inordinate delay and failure to vigorously press the action to a conclusion.

However, we do not feel plaintiffs lost their claim to damages by failure to vigorously press the action to a conclusion. Because of the extreme protracted period in Helms, equity well denied money damages but required defendant to correct the condition. We have no time element remotely approaching that of Helms in the case at bar.

Defendant, Groves, further relies on Taylor v. Canton Township, 30 Pa. Superior Ct. 305 (1906). There, because of the change in a highway, a farmer's crops were flooded. Money damages were denied because of the failure of plaintiff to construct a ditch and thereby drain off the excess water. This decision is bottomed on the right of the property owner to control the land necessary to drain off the water. In the case at bar, the distance between plaintiffs' land and the dam site is a number of hundreds of yards all covered with water. They had no right to enter upon the land of Stonebraker and clear out the spillway area.

Wherefore, the factual situations presented in both of the above cases relied upon by defendant, Groves, are easily distinguishable.

Wherefore, the necessary elements for the application of the doctrine of laches are found wanting.

II. *Is there liability upon John W. Golubic and Evelyn Golubic and the Estate of Alice A. Stonebraker, Property owners?*

There is no question that against a lower riparian the owner of upper riparian lands on a stream has a right to have the waters of the stream flow over his

lands as they would naturally flow. The lower owner may not obstruct the flow of the stream by a dam so as to flood the land of an upper riparian owner or to raise the level of the water in its bed to his detriment.[7]

The rule has been otherwise stated: "No one has the right to swell water or increase the swell of water upon the land of another without his permission"[8]

Also, that it is the right of a riparian owner to have an unobstructed flow of water in its natural course.[9]

Liability has been held against railroad companies frequently in the Pennsylvania reported cases for improper construction of culverts, drainage ditches and other similar man-made water courses which result in flooding of riparian property owners.[10]

Where a company has authority to improve a creek, but not to increase it beyond its natural flow, it is liable for injury caused by an overflowing through its negligence.[11]

It is, therefore, well established in our law that if a defendant property owner creates a condition upon his property which causes damage to his neighbor's property through the overflowing of water, he can be held liable.

[7] Helms v. Zeitzeff, supra.

[8] Mertz v. Dorney, 25 Pa. 519, 520 (1855).

[9] White v. Pennsylvania Railroad Company, 354 Pa. 397, 47 A. 2d 200 (1946).

[10] Pittsburgh, Ft. W. and C. R. Co. v. Gilleland, 56 Pa. 445 (1867); Fick v. Pennsylvania Railroad Company, 157 Pa. 622, 27 Atl. 783 (1893); Brown v. Pine Creek Railway Company, 183 Pa. 38, 38 Atl. 401 (1897); White v. Pennsylvania Railroad Company, supra; Buseck v. New York Central and St. Louis Railway Company, 99 Pa.Superior Ct. 310 (1930).

[11] White Deer Creek Improvement Co. v. Sassaman, 67 Pa. 415 (1871).

In the case at bar, it is clear that defendant, Stonebraker, did consent to the fill being placed upon her property which did result in an overflowing not only of her land but of plaintiffs' land as well. She was aware of this overflowing as was established through the testimony of Edwin Symons when he visited with her in an attempt to determine who was responsible for the placing of the dam. She was in a position to have legally alleviated the condition. Therefore, liability was established against defendant, Stonebraker.

Liability against defendants, Golubic, is not nearly as clear. The western boundary of Golubic's property is 72 feet from the channel. Therefore, Golubic did not have the right to go upon Stonebraker's property and break through the dam. This court has previously found that the placing of the wire to obstruct fish by Mr. Golubic did not in anyway cause an increase in the level of water upon plaintiffs' land. To impose liability upon Golubic, it must be found that the water was backed up as a result of the combined fill upon the Stonebraker property and the Golubic property and that if Golubic refused permission to waste upon his property there either could be no dam or it would not retain the water because of a run off on Golubic's land. There was no evidence to permit the court to come to that conclusion. Although there was considerable fill upon the Golubic property, there was no evidence that that was required in order to hold the water back and that the water would not have been held back by the fill which was deposited solely on the Stonebraker property. It was the burden of proof of those who desire to attempt to hold Golubic to establish that fact. This court was prepared to grant a compulsory nonsuit to Golubic at the conclusion of plaintiffs' case for plaintiff was

relying upon the Restatement of Torts §839, more particularly Illustration No. 6. That Illustration reads:

"A and B are in possession of adjoining parcels of land through which a stream flows. A number of small boys are accustomed to come to A's land and swim in the stream with A's permission. Without his permission they erect a dam in the stream to deepen the water and this backs up water on B's land. A learns of this but takes no steps to abate the dam. A is liable to B."

It is apparent that the liability of A is based on his control of his own land and the right to remove the obstruction without the consent or permission of any third person. Golubic could not have exercised that right, for the spillway and stream bed constructed by Groves was 72 feet from his nearest boundary.

However, this court denied the motion in order to permit defendants to attempt to establish any negligence of Golubic. Groves attempted to do so by evidence concerning the steel mesh. This evidence was not accepted by the court as being the cause of any of plaintiffs' damage.

Wherefore, no liability has been established against Golubic.

III. *Is there liability upon the S. J. Groves & Sons Company?*

Restatement of Torts 2d, sec. 158 reads:

"One is subject to liability to another for trespass, irrespective of whether he thereby causes harm to any legally protected interest of the other, if he intentionally:

"(a) enters land in the possession of another, or causes a thing or a third person to do so, or

"(b) remains on the land, or

"(c) fails to remove from the land a thing which he is under a duty to remove."

Illustration No. 5 under Comment on Clause (a), Subsection (i) reads: "A erects a dam across a stream, thereby intentionally causing the water to back up and flood the land of B, an upper riparian proprietor. A is a trespasser." This example is directly in point.[12]

Comment on Subsection (1), Illustration No. 1 of Restatement of Torts 2d, §161, dealing with the failure to remove a thing tortiously placed on land is as follows: "A, without B's consent or other privilege to do so, erects on his own land a dam which backs up water on B's land. This is a trespass, which continues so long as A maintains his dam in such a way as to flood B's land."

Although Groves had a right to go upon the land of Stonebraker as well as Golubic and waste its material, it had a common-law duty to assure that the result of the dam would not be the flooding of the property of a person who did not consent thereto. The flooding in this case of plaintiffs' property occurred in the year 1964 and was known to Groves.

Even prior to the Restatement of Torts, liability has been held against a person in the position of Groves. So in Masterson v. Lehigh Valley Railroad Co., 36 Pa. Superior Ct. 66 (1908), the lessee of the bed of an abandoned canal put drains in such a manner as to throw onto the land of plaintiff, who was an adjoining

---

[12] Restatement of Torts, §158, comment (i) of the original Restatement was accepted in Pennsylvania in Kopka v. Bell Telephone Co. of Pennsylvania, 371 Pa. 444, 91 A. 2d 232 (1952).

property owner, a greater volume of water than accustomed, resulting in plaintiff's damage. Recovery was permitted against the lessee.

In Miller v. McGowan, 29 Pa. Superior Ct. 71 (1905), the husband built a ditch on land subsequently titled in his wife's name which diverted a stream so as to flood the land of plaintiff after title was in the wife. She did nothing to remedy the situation. Both husband and wife were held liable.

Defendant, Groves, relies upon Valley Forge Gardens, Inc. v. James D. Morrisey, Inc., 385 Pa. 477, 123 A. 2d 888 (1956), for the proposition it is not liable unless it performed its work tortiously or willfully inflicted harm. A similar holding is that of Ference v. Booth and Flinn Co., 370 Pa. 400, 88 A. 2d 413 (1952). Both of these cases hold that where an independent contractor is constructing a highway in accordance with plans and specifications, although it does not have governmental immunity, it will not be held liable for damages unless tortious conduct is established.

The reading of the factual situation of both cases causes the conclusion that the rule is applicable only when the contractor is, in fact, doing the work in accordance with its contract and the accompanying plans and specifications. Groves was not requested by the Highway Department to erect a dam. Disposal of its wastage was not required in any particular manner by plans previously approved by the Highway Department. The agreement between Groves and the property owners was private between them only. Although a representative of the Highway Department stated that they should have used Highway Department forms and received its consent by such forms, Groves did not have any written contract concerning wastage with Mr. Stonebraker and used its

own forms with Golubic. It is true that under the specifications Groves was to bring the bed of the stream to a predetermined point above sea level. However, according to its engineer who was present at the time of the breaking of the dam, it was necessary to remove approximately four feet of the bed of the spillway or stream area through the fill in order to permit free passage of water sufficient to lower the level of the dam and thereby drain the water which had tortiously been permitted to accumulate upon the plaintiffs' property. The principle of the Valley Forge and Ference cases is sound law but inapplicable to the facts in the instant case.

Wherefore, this court finds that the plaintiffs have established their right to equitable relief against Groves.

IV. *What are the damages?*

The Pennsylvania appellate courts have decided on numerous occasions that when standing timber is destroyed the damages are to be measured by determining the difference in the value of the land upon which the trees grew before and after the injury complained of, although there may be exceptional circumstances when the evidence shows the trees in question have a selling value separate and apart from the land, for example, trees growing on a nursery farm.[13]

Where the timber was growing and not marketable, the value of the timber is not the proper measure of damage, but rather the injury to the land.[14]

---

[13] Ribblett v. Cambria Steel Co., 251 Pa. 253, 259, 96 Atl. 649 (1916); Mink v. New York Central Railroad (No. 2), 31 D. & C. 2d 518 (1963), where Christmas trees were held to have a separate value apart from the land.

[14] Bullock v. Baltimore & Ohio R.R. Co., 235 Pa. 417, 84 Atl. 421 (1912).

Likewise, where land is burned and there is old and young timber lost in the fire, the measure of damages is the difference in the value before and after the fire and not that of the timber.[15]

Where an entire yard is inundated by a mistaken dumping of dirt thereby destroying shrubs and trees, the measure of damages is the market value before and after the injury.[16]

In Lynch v. Troxell, 207 Pa. 162, 56 Atl. 413 (1903), a dam caused an overflow onto plaintiff's lands. The court held that the proper measure of damages is the value of the property destroyed and such monies as may be required to enable the property owner to restore his property to its former condition and to pay the property owner for having deprived him of the use of his property up to the time that the suit was brought. When a dam covers property, if the waters are allowed to recede, in addition to the value of the trees or shrubbery actually destroyed, the cost of restoring the property to its condition before it was injured will be allowed unless such cost should equal or exceed the value of the property, in which event the value would be the measure of damages, to which should be added the actual loss sustained by being deprived of the full use of the property from the time of the injury until the institution of suit.[17]

---

[15] Baylor v. Stevens, 16 Pa. Superior Ct. 365 (1901).

[16] Norris v. Philadelphia, 49 Pa. Superior Ct. 641 (1912).

[17] Likewise in Keats v. Gas Company of Luzerne County, 29 Pa. Superior Ct. 480, 486 (1905), where a stream flooded plaintiff's land and did damage to a dwelling house which was not permanent, the measure of damages was found to be the cost of restoring the property to its former condition together with compensation for the loss of its use unless such cost should exceed the value of the building, in which case such value would be the measure of damages.

Plaintiff relies upon Restatement of Torts, §929. There, if there is not total destruction, the damages include compensation at plaintiff's election of the difference between the value of the land before the harm and the value after the harm or the cost of restoration which has been or may be reasonably incurred or if a separate portion of the land has been damaged, the loss in its value and the loss of use of the land and discomfort and annoyance in an action brought by an occupant.

In this case, there has been no claim for discomfort or annoyance and there has been no testimony as to the value of the loss of use of the land. In fact, it would have been difficult if not impossible to show such value for the land had not been used for many years and was in such a location that it would be extremely difficult to have rented the land to a third person.[18]

Comment on clause (a) ii, at page 663: "With reference to many things, however, such as . . . immature timber trees, it is impracticable to establish a separate value and the owner's loss can only be measured by the diminution in the exchange value of the land or in its value to the owner."

Although there was testimony in this case by a timber merchant concerning his willingness to purchase the standing timber had the flood not occurred, he was badly shaken on cross-examination by a previous letter he had written indicating that if the trees were several years more mature, he would be inter-

---

[18] This section of the Restatement has been accepted in Pennsylvania in Augustine v. E. M. Brown, Inc., 205 Pa. Superior Ct. 33, 206 A. 2d 399 (1965), being a per curiam opinion of 34 D. & C. 2d 570. Comment on clause (a)ii of Restatement of Torts, §929, has been accepted in Evans v. Moffatt, 192 Pa. Superior Ct. 204, 160 A. 2d 465 (1960).

ested in purchasing them. In addition, on further cross-examination he indicated that he really was not interested in purchasing timber in the bottom land, but only the timber on the sides of the hills, for which he, in fact, made an offer to plaintiffs. We do not conclude, therefore, that it was established by competent evidence that the trees in this case had any independent value as timber at the time of the flooding and their death. Rather, we viewed this timber as a mixture of some mature and some immature timber which do not arise to the level of "exceptional circumstances" allowing a separate value. In that the cost of restoration of the acreage at $100 per acre is greater than the value of the land itself and greater than the damage sustained by plaintiff on a before and after basis, damages are not given therefor. Rather, it is concluded that the damage sustained by plaintiffs in this case is the difference between the before and after value of the parcel as a whole, which is previously concluded in the findings of fact as $1,000.

Although the Restatement of Torts, §929, permits plaintiffs an election between the difference of the value of the land before and after the harm or the cost of restoration which has been or may reasonably be incurred, restoration of $100 per acre or $125 per acre, depending on whether the brush is included in the restoration cost, could not reasonably be incurred under the facts of this case for the type of land here involved.

The money damages as found in this case are $1,000.

## CONCLUSIONS OF LAW

1. In order to establish the doctrine of equitable laches, it must be shown that the complaining party is guilty of want of due diligence in failing to

institute his action which was to the other's prejudice. Without injury, there can be no laches.

2. A lower riparian owner can be held responsible for an obstruction to the natural flow of the stream by a dam which results in the flooding of the upper riparian owner's land.

3. Restatement of Torts, §839, imposing liability on a property owner who permits persons to go upon his land and dam up a stream flooding an upper riparian owner, is limited to liability upon the property owner who has control of the area of the stream which has been dammed. A third person owning lands 72 feet from the stream cannot be held responsible for the failure to break the dam under this section.

4. Restatement of Torts 2d, §158, imposes liability upon a person going upon the land of another creating a dam which thereby backs up water upon an upper riparian owner's land.

5. When land is inundated by water, separate damages will not be allowed for the trees which die as a result thereof unless it be established by competent evidence that the trees had an independent value as timber at the time of the flooding and their death.

6. The measure of damages in the event of the flooding of land is the value of the overall parcel before and after the flooding.

7. Although the Restatement of Torts, §929, permits a plaintiff an election between the difference of the value of the land before and after the harm or the cost of restoration, which has been or may reasonably be incurred, if it is apparent that the cost of restoration is far in excess of the difference between the value of the overall parcel before and after the damage was incurred and if the restoration will improve the condition of the land over that existing prior to the flood and be an enhancement to plain-

tiff, the cost of restoration will not be allowed as a proper measure of damage.

## DECREE NISI

And now, January 31, 1972, the chancellor does hereby enter the following decree nisi:

1. Plaintiffs, M. Edwin Symons a/k/a Maitland E. Symons and Anna Symons, husband and wife, are hereby awarded as damages against S. J. Groves & Sons Company and the Estate of Alice A. Stonebraker the total sum of $1,000.

2. Neither the S. J. Groves & Sons Company, nor the Estate of Alice A. Stonebraker, its representatives, agents or employes, shall in anyway restrict the natural flow of the east branch of the Neshannock Creek in any manner whatsoever which will cause a backing or accumulation of water upon the lands of plaintiffs, M. Edwin Symons a/k/a Maitland E. Symons and Anna Symons, husband and wife.

3. This court will retain jurisdiction of this action to assure that the decree of the court is obeyed.

4. The prothonotary shall notify all the parties or their attorneys of this adjudication and of the date of the filing hereof.