# Ribblett *v.* Cambria Steel Co., Appellant.

*Practice, C. P.—Statements of claim—Amendments at trial—Judicial discretion.*

1. In an action of trespass brought by a husband and wife against a steel company for injuries to two adjoining tracts of land, owned by the husband and wife in severalty, alleged to have resulted from the maintenance, in the neighborhood, of a burning dump heap, from which noxious fumes and gases, injurious to plant life, were emitted, the court did not err in permitting the husband to amend his statement at the trial by striking out the name of his wife and limiting the claim to the damages occasioned to the property owned by the husband; such an amendment did not constitute a new cause of action or make the record too vague or indefinite to sustain a judgment, although no written motion was filed.

*Real property—Trespass to land—Nuisance—Damage—Evidence —Insufficiency—Judgment for defendant n. o. v.*

2. Where in such case, it appeared that the trees on plaintiff's farm had died and that the crops had failed, but that such result might have been produced by the failure of plaintiff to fertilize the land and to employ proper assistants, or to fires with which the farm had been swept on more than one occasion, the burden was upon the plaintiff to produce evidence to show that the losses complained of resulted from the alleged tortious acts of defendant.

3. Where in such case, the only expert testimony to connect defendant with the injuries complained of was the testimony of a "pathologist" who admitted that he had no experience in the analysis of soils or gases, who had not examined the soil of plaintiff's farm and who did not know what effect, if any, the gases alleged to have been emitted from the burning refuse had upon plant life, and who did not state that in his opinion the vegetation was in fact injured or destroyed thereby, and where plaintiff's lay witnesses stated that they merely surmised that the gases produced the injuries complained of, and where there was no evidence to show the market value of the trees destroyed, before and after the maintenance of the alleged nuisance, a verdict for plaintiff, awarding damages for the loss of the crops and trees, was not supported by the evidence.

4. Where in such case, the plaintiff alleged that by reason of the maintenance of the refuse pile, he had been compelled to abandon his dairy business, but where he produced no accurate evidence of the income which he derived therefrom, or of the value of the business, there was no evidence to form the basis of an intelligent estimate of the extent of plaintiff's loss.

5. Where in such case, plaintiff alleged that his health had been impaired by reason of the fumes, but where there was no testimony produced to show the effect of the gases upon plaintiff's health, or any evidence of the amount expended for medical attendance, although plaintiff's physician was called as a witness, a verdict and judgment for plaintiff was not supported, and the judgment was reversed and entered for defendant n. o. v.

Argued Sept. 27, 1915. Appeal, No. 117, Oct. T., 1915, by defendant, from judgment of C. P. Cambria Co., Sept. T., 1912, No. 367, on verdict for plaintiff, in case of Hiram Ribblett v. Cambria Steel Company. Before BROWN, C. J., MESTREZAT, POTTER, STEWART, MOSCHZISKER and FRAZER, JJ. Reversed.

Trespass to recover damages for injuries to plaintiff's health and property resulting from the maintenance of a dump, consisting of piles of burning refuse. Before O'Connor, J.

The opinion of the Supreme Court states the facts.

Verdict for plaintiff for $2,000.00 and judgment thereon. Defendant appealed.

*Error assigned,* among others, was in refusing to enter judgment for defendant n. o. v.

*J. C. Davies,* with him *H. S. Endsley,* for appellant.

*H. W. Storey, Jr.,* and *Alvin Sherbine,* filed a paper book, but did not appear for appellee.

Opinion by Mr. Justice Moschzisker, January 3, 1916:

This was an action in trespass instituted in July, 1912, by Hiram Ribblett and Emma Ribblett, his wife, to recover damages alleged to have been suffered by them as the result of the defendant's maintenance, in close proximity to the farm upon which they resided, of a dump, consisting of a large pile of burning refuse, which emitted "quantities of fumes, sulphurous and other gases that are deadly to and destructive of vegetable life." The plaintiffs averred in their statement of claim that the farm in question was composed of 41 acres of land belonging to Hiram Ribblett and 31 acres belonging to Emma Ribblett; that these two tracts constituted one property, and had been occupied and enjoyed by them as such for many years; that the portion of the land not suitable for farming purposes was used in the pasturing of milch cows; that, owing to gases emitted from the defendant's dump, "the plaintiff's business of farming, gardening, fruit raising, marketing and dairying had been entirely destroyed"; that the productive qualities of the land had been injured; that the once

healthful and pleasant surroundings of their home had been made intolerable; and that their health had been impaired, causing them to incur expenses for medicines, medical attendance, etc. Subsequently the claim of permanent injury to the productive quality of the soil was expressly abandoned, the evidence showing that crops were being successfully raised thereon.

During the course of the trial, it developed that the two pieces of land alleged to have been injured, were owned in severalty by the respective plaintiffs; whereupon the court permitted Hiram Ribblett to amend the statement by striking out the name of Emma Ribblett and limiting the damages claimed to the 41 acres owned by him. This amendment was objected to upon several grounds; but the defendant did not plead surprise or ask for a continuance of the trial. While it might have been better practice to have required the plaintiff to file a formal written amendment of his statement of claim, yet we cannot agree with the appellant that the amendment granted at bar practically constituted the cause of Hiram Ribblett a new action, or that it made the record too vague and indefinite to sustain a judgment; hence, the assignments of error which pertain thereto are overruled. But, after reading all the testimony adduced by the plaintiff, without considering the answering testimony of the defendant, we are impelled to the conclusion that the verdict of the jury, and the judgment based thereon, cannot be sustained.

The evidence depended upon by the plaintiff was not only vague and indefinite, but entirely insufficient, first, to show that the alleged tortious acts of the defendant had the effect attributed to them, and, next, if the gases from the dump affected the plaintiff in the manner alleged, then the evidence adduced was either incompetent or insufficient to prove the monetary damages suffered. At the time of trial, in September, 1914, Hiram Ribblett was 84 years of age and his wife was 79, and it appeared that the trees on their farm never had been

sprayed and no lime had been placed upon the land for
15 or 20 years, the only fertilization being the use of
manure from the few cows and horses kept on the place.
It further appeared that, at the time the crops failed
and the trees commenced to die (a few years before the
date of trial), the only working assistants on the farm
were a couple of boys; moreover, that, on more than one
occasion, fires had swept over the land, which admittedly
affected the timber thereon.   In view of these established
facts, which in themselves might well explain the al-
leged failure of crops and the loss of trees, in order
properly to show that these injuries were due and at-
tributable solely to the noxious gases from the defend-
ant's dump (which was anywhere from 1,000 to 4,000
feet distant, and in a spot where the prevailing winds
would carry the fumes away from rather than to plain-
tiff's land), it was the duty of the plaintiff to produce
the evidence of an experienced chemist, who could give
the court and jury the benefit of his special knowledge,
by way of an expert opinion based upon the testimony in
the case and on such scientific investigations of the ma-
terial at hand as he might be able to make.   Further-
more, unless such a witness was prepared to say that, in
his opinion, the gases arising from the dump, under the
circumstances in the case, could, and in all probability
did, cause the injurious results complained of, or, unless
the facts testified to by him were such as would enable
a jury of laymen to reach that conclusion, unassisted by
the professional opinion of an expert, then the case
should not have been submitted to the jury.   Instead,
however, of presenting a chemist who had some experi-
ence in the examination of gases and soils, and who knew
by special study or observation the effect of such gases
upon trees and growing vegetation, the plaintiff called a
young man, 21 years of age, who did not claim to be a
chemist, but testified that he was a "pathologist."   This
witness admitted he had had no experience in the analy-
sis of soils or gases, and he did not claim to have made

such an examination of the soil of plaintiff's farm; he said that he had merely submitted some of the earth, taken from one spot on the farm, to a test, in order to ascertain whether it contained sulphates. He also said that, after igniting some material taken off the defendant's dump by a flame of natural gas, he had tested fumes arising therefrom, for the purpose of ascertaining whether the vapors contained sulphur-dioxide; but he admitted that he had not made any quantitative tests of either the soil or the gases from the dump material, simply stating he found evidence of the ingredients for which he was looking, without saying anything definite in regard to the precise quantities in which they existed. In fact, he admitted that he did not know whether or not sulphuric acid or sulphides were generally found in land, and that he was ignorant as to just what effect sulphur-dioxide gases had upon plant life. Finally, the witness was asked, "How would you know it would hurt vegetable life on that farm," and replied, "I didn't say that," adding that he did not know whether or not the gases ever actually got to the farm. Notwithstanding this man's apparent limited capacity as a chemist, since the question of the qualification of an expert is a matter largely within the discretion of the trial judge, we should hesitate to reverse on a difference of opinion in relation thereto, had the substance of his expert testimony measured up to the requirements of the law; but the witness nowhere explicitly stated that, in his professional opinion, the vegetation or trees on the plaintiff's farm were in fact injured or destroyed by or through the effect of the gases emitted from defendant's dump, or that there was any substantial probability that such was the case. The plaintiff's lay witnesses were not much stronger, one saying he "surmised" that the gases caused the trees to die, and another stating, "I didn't say the gas from the dump killed them" (the trees) —"I said I thought it did because it would kill al-

most anything," adding, "I don't know whether it was the cause or not."

The witnesses all agreed that the fumes from the defendant's dump caused considerable annoyance for a number of years to every one in the neighborhood; but there was no testimony produced to show in detail the effect of these gases upon the health of the plaintiff, so as to enable a jury intelligently to estimate the compensation he was entitled to recover on that score. Neither was there any evidence of the amount expended for medical attendance, etc., although the doctor was called as a witness. In point of fact, the evidence depended upon to liquidate the plaintiff's damages was, if anything, even weaker than that relied upon to make out his cause of action, and this inadequacy was manifest in every branch of the case.

While we have held that the ordinary rule for the ascertainment of damages where land is appropriated under the right of eminent domain, did not control in cases somewhat like the one at bar, yet, we have on numerous occasions decided that, when standing timber is destroyed, the damages therefor are to be measured by determining the difference in the value of the land, upon which the trees grew, before and after the injury complained of (Mahaffey v. New York Central & Hudson River R. R. Co., 229 Pa. 285-287; Savings & Trust Co. of Indiana v. Penna. R. R. Co., 229 Pa. 484-489; Bullock v. Balto. & Ohio R. R. Co., 235 Pa. 417). There may be exceptional instances, when the evidence shows the trees in question to have had a selling value separate and apart from the land (for example, trees growing on a nursery farm), where a different rule would apply; but, under the facts at bar, there can be no doubt that the proper way to determine the pecuniary damage suffered by the destruction of the plaintiff's trees was through the application of the ordinary rule just referred to. The only testimony produced, however, relative to the damage thus suffered was the expression of opinion by two

witnesses as to the actual money value of the trees without regard to their special connection with the plaintiff's farm, although one of them asserted that the real worth of the trees consisted in their "value for shedding storms and helping drouths." Neither of these witnesses showed any special qualification to express an opinion on the market value of trees; but aside from that, their testimony was based on a wrong theory of the measure of damage, and, therefore, was incompetent and should not have been received. When this testimony is omitted, there is no evidence in the case to show the monetary damages suffered by the plaintiff through the loss of the trees in question.

In Robb v. Carnegie Bros. & Co., 145 Pa. 324, 341, et seq. (also see Irwin v. Nolde, 164 Pa. 205, 208), we state a clear rule as to how an alleged loss on crops is to be proved in a case of this kind; but the rule there laid down was not followed in the present instance. While some of the witnesses produced by the plaintiff attempted to show the failure of crops in certain years, they did not say what was planted during those years, nor did they shed any sufficient light upon the general subject to enable a jury to attribute the falling off of the crops to the causes alleged against defendant, or properly to value in dollars and cents the depreciation alleged to be due to the fault of defendant.

No witness definitely stated that the gases from the defendant's dump made it necessary for the plaintiff to abandon his dairy business, although such an intimation may be contained in the testimony. However that fact may be, the damage suffered was not proved. Mrs. Ribblett said they simply kept a milk book, and had no regular books of account. Another witness for plaintiff testified that, as near as he could state, the net profits of the dairy "run about $100.00 a month"; but, on cross-examination, he admitted that, in figuring this $100.00 a month, he did not take into consideration certain expenses; and finally, the witness said he was in error

when he designated that amount as the "net income." Since no books of account were kept, it might not have been possible to state the exact amount of the loss suffered through the falling off of the dairy business; but, in order to take the case to the jury, the plaintiff was bound to produce more exact testimony than he did. He should have shown, at least approximately, the gross income, and then estimated the expenses, itemizing them as far as possible, and thus arrive at some kind of a net result that the jury could take as a guide, if they believed the testimony. As it was, the evidence relied upon formed an entirely insufficient basis on which to found any intelligent determination. Moreover, it plainly appeared that the land which was used for grazing purposes in connection with the dairy—the pasturage alleged to have been affected by the gases complained of— was the 31-acre tract owned by Mrs. Ribblett, and not the 41 acres owned by plaintiff. On the whole, there was such a lack of competent, requisite proofs that binding instructions should have been given for the defendant.

The thirteenth assignment, which complains of the refusal to enter judgment non obstante veredicto for the defendant, must be sustained; therefore, it is unnecessary specifically to pass upon the other assignments.

The judgment is reversed and is entered for the defendant.